Docket Number: 20-14214

# UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

---

Christian Ronnie
APPELLANT

vs.

Office Depot, Inc. / U.S. Department of Labor
APPELLEE

---

Violations of:
Dodd Frank Wall Street Reform and Consumer Protection Act (CFPA) - 12 U.S.C. § 5567
Sarbanes-Oxley Act (SOX) – 18 U.S.C. § 1514A

On Appeal from the U.S. Department of Labor
Administrative Review Board
ARB Case Number 2019-0020

———————————

APPELLANT'S BRIEF
———————————

Christian Ronnie
7190 W Sunset Blvd., 84A
Los Angeles, CA 90046
+1 619 831 5813

*Ronnie v. U.S. Department of Labor*, 20-14214 – CIP-1 of 2

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Local Rules 26.1 and 27-1(a)(9), counsel for Respondent U.S. Department of Labor certifies that the following persons and entities have or may have an interest in the outcome of this appeal:

Administrative Review Board, U.S. Department of Labor

Brand, Jennifer, Associate Solicitor, Fair Labor Standards Division, Office of the Solicitor, U.S. Department of Labor

Burrell, Thomas H., Administrative Appeals Judge, Administrative Review Board, U.S. Department of Labor

Chu, Stella S., Littler Mendelson, P.C. (*Counsel for Office Depot*)

Colbert, Daniel, Attorney, Fair Labor Standards Division, Office of the Solicitor, U.S. Department of Labor (*Counsel for Respondent*)

DeBlasio, Patrick G., III, Littler Mendelson, P.C. (*Counsel for Office Depot*)

Guenther, Megan E., Counsel for Whistleblower Programs, Fair Labor Standards Division, Office of the Solicitor, U.S. Department of Labor

Keen, Stanley E., Deputy Solicitor for National Operations, Office of the Solicitor, U.S. Department of Labor

Leslie, Heather C., Administrative Appeals Judge, Administrative Review Board, U.S. Department of Labor

Marcus, Sarah, Deputy Associate Solicitor, Fair Labor Standards Division, Office of the Solicitor, U.S. Department of Labor

McGinley, James D., Chief Administrative Appeals Judge, Administrative Review Board, U.S. Department of Labor

*Ronnie v. U.S. Department of Labor*, 20-14214 – CIP-1 of 2

The ODP Corporation ("ODP"), a publicly traded corporation (Office Depot's owner)

Office Depot, Inc.

Ronnie, Christian (*Petitioner*)

Stewart, Milton Al, Acting Secretary of Labor, U.S. Department of Labor (*Respondent*)

## Statement Regarding Oral Argument

The Appellant, Christian Ronnie, requests oral argument as he believes it will help in eliminating irrelevance and summarizing the key indisputable facts of what financial reports the Appellant was engaged in, and why these results disclosed to the general public through SEC filings was in fact a protected activity.

## Table of Contents

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

DISCLOSURE STATEMENT……………………………………………………1

STATEMENT REGARDING ORAL ARGUMENT………………………………..3

TABLE OF CONTENTS…………………………………………………………4

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION……5

STATEMENT OF THE ISSUES………………………………………………….6

STATEMENT OF THE CASE AND ARGUMENT………………………………...8

SUMMARY OF THE ARGUMENT………………………………………………..22

STATEMENT OF FACTS………………………………………………………...24

CONCLUSION……………………………………………………….………….29

CERTIFICATE OF COMPLIANCE………………………………………………..30

CERTIFICATE OF SERVICE……………………………………………………31

## Statement of Subject-Matter and Appellate Jurisdiction

An Online Whistleblower / Retaliation Complaint was filed on April 21, 2016 after retaliation ocurred resulting in the Appellant being fired from the publicly traded company on April 19, 2016. The violation of labor law disccrimination/retaliation statutes occurred in Boca Raton, FL at the headquarters of Office Depot, Inc., and the complaint was filed electronically from the Appellant's residence in Ft Lauderdale, FL. The violations that occurred were statutes enforced by Occupational Safety and Health Administration (OSHA), including the Dodd Frank Wall Street Reform and Consumer Protection Act (CFPA) – 12 U.S.C. § 5567 and Sarbanes-Oxley Act (SOX) – 18 U.S.C. § 1514A. Investigators Maria Colon and Gloria Colon began review on April 22, 2016 with requested documents collected on June 2, 2016. After not being able to contact the investigators, the Appellant finally received a response dismissing the case on November 15, 2017. The case was appealed to the Administrative Law Judges (ALJ) in a timely fashion, and the ALJ decision was appealled to the Administrative Review Board in a timely fashion, pursuant to 29 CFR § 18, with a response granting Respondent's Motion for Summary Decision in the claim being Dismissed with Prejudice on September 29, 2020.

## Statement of the Issues

The Administrative Law Judge (ALJ) dismissed the case with Prejudice, granting Respondent's motion for summary decision, claiming the Appellant was not engaged in a protected activity. The Appellant was a salaried finance employee at a publicly traded company. Furthermore, the Appellant was responsible for, what was disclosed to investors as, the company's "critical priority" which went by the name of various titles on SEC filings, public disclosures, and internal communications. This key report was referred to as US Retail Store Optimization Plan, sales lift, sales transfer, sales transfer scorecard, sales synergies, and Office Depot/Office Max merger integration. After finding material errors in reporting this critical priority, Appellant reasonably believed that the company was reporting misleading information on public disclosures and SEC filings. As stated in the SOX and CFRP statutes, this reasonable belief that the information being reported was misleading is all the Appellant needed to exercise his rights under statutes 12 U.S.C. § 5567 and 18 U.S.C. § 1514A. Appellant found indisputable inaccuracies resulting from errors in the sales lift model, which were in place before the Appellant was hired, and these inaccuracies were more than misleading, they would cause investors to make opposite investing decisions during a pending acquisition decision. The disclosure of this information, along with the reported retaliation to HR and request to distance himself from the report that he reasonably believed to be misleading, is a protected activity. The criticial priority was reported on the SEC 10K filing as "lower than projections" when it was really higher than expectations, and would have changed

investor behavior. Since the finance employee recognized this as misleading information, the employee of the publicly traded company was protected from retaliation in his efforts to disclose information about the cause of inaccuracies and attempts to "object to, or refuse to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed" to be misleading investor decision making through SEC filings, as stated in the whistleblower statutes.

**Statement of the Case and Argument**

The Administrative Review Board erroneously determined that being a finance employee at a publicly traded company may not be a protected activity. Below, an explanation of the Appellant's responsibility and how the results he reported were a key driver of stock price will be provided. SEC filings referencing his reported results, performance documents confirming he was responsible for reporting the company's critical priority, and e-mails will prove his role as a senior financial analyst was without a doubt a protected activity. Additionally, further proof will be provided that this activity was more than just a contributing factor, it was the documented cause of retaliation and firing the Appellant. The Appellant uncovered more than just "misleading" information disclosed on SEC filings, the Appellant found that results of a critical priority were indisputably so substantially inaccurate, that they would have caused opposite actions of investors, as described herein.

As a senior financial analyst working at the publicly traded company (ticker: ODP), the Appellant was covered under each of the statutes, Sarbanes Oxley Act (SOX) 18 U.S.C. §1514A and Consumer Financial Protection Act of 2010 (CFPA), Section 1057 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 12 U.S.C. § 5567.

The Consumer Financial Protection Act of 2010 (CFPA) states the following

"

§1057 (b) Definition of Covered Employee - For the purposes of this section, the term 'covered employee' means any individual performing tasks related to the offering or provision of a consumer financial product or service.

"

with the following activities that the Appellant engaged in included

"

(1) provided, caused to be provided, or is about to provide or cause to be provided, information to the employer

...

(4) objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) **reasonably believed** to be in violation

"


The Sarbanes Oxley Act (SOX) 18 U.S.C. §1514A states the following

"

(a) Whistleblower protection for employees of publicly traded companies.--No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)) including any subsidiary or affiliate whose financial information is included in the consolidated

financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee

"

with the following activities included

"

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee **reasonably believes** constitutes a violation

"


On each of these statutes, the Appellant is covered since he discovered substantially misleading information related to the performance of the publicly traded company. The results of what was disclosed to investors as a "critical priority" was so indisputably inaccurate that the resulting correction would have resulted in investors making opposite investing decisions during a $6.3 billion dollar acquisition being reviewed by the Federal Trade Commission (FTC).

Christian was never on a performance plan nor received any formal warning before reporting harassment to Human Resources, requesting to change teams and remove himself from the task that he reasonably believed was providing misleading information on SEC filings and public disclosures.

Christian Ronnie, the Appellant, was hired by publicly traded company, Office Depot, Inc. as a salaried finance employee on April 20, 2015. Christian was a highly prestigious finance recruit, as he was a graduate of perhaps the top-rated finance program in the world, the Kelley Undergraduate Investment Banking Network, a Certified Management Accountant, and a successful graduate of Johnson & Johnson's two-year Finance Leadership Development Program.

Christian was hired shortly after Staples Inc. announced it was acquiring Office Depot, Inc. for $6.3 billion USD, and while the Federal Trade Commission (FTC) was reviewing industry competitiveness to determine whether the acquisition would be approved or if it would be too monopolistic and anti-comptetitive. Christian's job, and key responsibility as stated on his Performance Document (Exhibit 2), was Sales Transfer. Sales Transfer was the reporting of the company's "critical priority" – the US Retail Store Optimization Plan – and was referred to as various names on SEC filings, public disclosures, and internal communications. These names included Sales Lift, Sales Transfer, Sales Synergies, Store Closure Results, Sales Transfer Scorecard, and Office Depot/Office Max merger integration results. These sales transfer results

were the results of combining stores after Office Depot Inc. acquired Office Max years before. The results were highly important because it was the company's "critical priority" of synergizing with Office Max and combining retail stores.

These results were of highest importance to investors and the general public for two reasons. The first is that it was the reported performance of synergizing with Office Max and the company's key critical priority after acquiring Office Max. The second is that it was the leading indicator of how monopolistic the office supply sector is and how anti-competitive the pending $6.3 billion acquisition from Staples would be. Sales lift reported how much sales were transfered and retained from closing competing Office Depot/Office Max stores. There were only two significant competitors in the office supply space – Office Depot / Office Max and Staples. The higher the sales retention, or sales lift, the more monopolistic the office supply space is, and the less likely it would be that the FTC would approve the pending acquisition with Staples. A major driver of investor decision and stock price was the speculation on whether the FTC would approve the acquisition,  resulting in the stock price jumping up to the announced purchase price. The US Retail Store Optimization Plan, or sales lift, involved the company's "critical priority" of identifying competing stores after the acquisition, synergizing them, cross-functional company efforts to retain customers, and reporting the results.

Any educated investor understands that when a publicly traded company acquires another publicly traded company, the stock price will instantly become the

higher purchasing price as long as the FTC will approve the acquisition. Since the industry was too monopolistic, there was speculation on if the acquisition would be approved. This speculation was the key driver of stock price, as the stock price was fluctuating between the purchase price and original price based on the percentage chance of the acquisition being approved. The sales lift of more than 50%, which was adjusted from a lift of about 30% after Christian uncovered a redirection, indicated an environment that was too monopolistic, with a result of the FTC declining the acquisition.

Before Christian found the errors in the sales lift model, the erroneous ~30% results were disclosed on earnings disclosures and SEC filings as "lower than expected". This "below expectations" result (Exhibit 1) suggested a more competitive market, that the FTC would approve the acquisition, and the company's "critical priority" was not realizing the operating performance as expected. The corrected amount of lift of more than 50% indicated a completely different scenario, where the market was too monopolistic and anti-competitive, that the FTC would decline the acquisition as being too anti-competitive, and the company was performing better with regards to their "critical priority". The accurate results of more than 50% would have helped investors with aligning their speculations with the ultimate outcome of the FTC declining the acquisition.

Exhibit 1 shows reference to the sales transfer results in various public disclosures, including the 2015 10K SEC filing, where it states:

13

"

We may be unable to close all of the stores targeted for closure or such store closures may not result in the benefits or cost savings at levels that we anticipate due to factors such as sales transfers to stores remaining open being below our projections.

"

Exhibit 1

## Office Depot, Inc. Announces Second Quarter 2015 Results

*Continues to Deliver Substantial Improvement in Operating Income*

*Accelerates U.S. Retail Store Portfolio Optimization*

BOCA RATON, Fla.--(BUSINESS WIRE)--Aug. 4, 2015-- Office Depot, Inc. ("Office Depot", or the "company") (NASDAQ: ODP), a leading global provider of office products, services, and solutions, which entered into a definitive agreement on February 4, 2015 to be acquired by Staples, Inc. ("Staples"), today announced results for the second quarter ended June 27, 2015.

"In the second quarter we significantly improved operating income versus last year, primarily due to continued excellent execution on our merger integration, synergies and efficiencies, and positive same-store sales growth," said Roland Smith, chairman and chief executive officer for Office Depot. "While total company sales declined compared to prior year, driven primarily by planned store closures and foreign currency translation, continued success in the consolidation of our U.S. retail store portfolio and increased operational effectiveness drove positive quarterly same-store sales growth for the first time in many years. We are especially pleased with our performance in light of the inherent disruption associated with the pending acquisition by Staples. We continue to focus on executing our Critical Priorities and remain on track with the Office Depot/OfficeMax merger integration and our European restructuring."

### 2015 10K

"we may be unable to close all of the stores targeted for closure or such store closures may not

result in the benefits or cost savings at levels that we anticipate due to factors such as sales



transfers to stores remaining open being below our projections"

## 2015 Examples of optimization results communications (sales synergies)

### North American Retail – 4Q15



- 4Q15 comparable sales flat; total sales decreased 9% driven by planned store closures
  - ✓ Comp sales benefitted from sales transfer from closed stores as well as increases across all major categories, with the exception of a decline in computers and related technology

### 2015 Accomplishments

- Significant progress on both short and long term critical priorities
- Second year of strong execution on OfficeMax integration plan
  - ✓ Converted all (nearly 700) OfficeMax stores to the Office Depot operating model and IT platform
  - ✓ Consolidated loyalty, printed media, and other advertising programs
  - ✓ Substantial progress on COGS, indirect purchasing, transportation and SKU harmonization initiatives
  - ✓ Delivered $300 million in incremental synergies in 2015
- On track for completing U.S. store optimization program in 2016 with a

## Outlook Summary

- Lower total company sales compared to 2015, primarily due to store closures, overall challenging market conditions in our industry, and continued business disruption from the pending acquisition by Staples, which is expected to continue through at least the first half of 2016

- Continue to expect more than $750M in run-rate merger synergy benefits from the OfficeMax integration. Due to the pending acquisition by Staples,

### Consolidated Financial Summary – 4Q15



- 4Q15 sales down 9% from 4Q14; down 3%' adjusted for the following items:
  - ✓ U.S retail store closures (4 percentage points)

## 2016 Critical Priority Highlights

- Continue implementation of remaining integration plans from OfficeMax merger in order to achieve expected synergies and efficiencies

- Continue improvements in the overall retail customer experience

### Staples Acquisition Summary

- On February 4, 2015, Office Depot entered into a definitive agreement with Staples to acquire all of its outstanding shares
- Office Depot shareholders will receive $7.25 in cash and 0.2188 of a share in Staples stock at closing for each share of ODP
- Transaction was approved by both companies' Board of Directors and overwhelmingly approved by Office Depot stockholders
- Regulatory update:
  - ✓ Clearance received from Australia, New Zealand, and China
  - ✓ European Commission approval subject to divestiture commitments
  - ✓ Canadian Competition Bureau is challenging the transaction
  - ✓ U.S. FTC is challenging the transaction and Staples and Office Depot are contesting the FTC's decision. The hearing in federal district court is expected to commence on March 21, 2016, with a decision expected by May 10, 2016



15

Exhibit 2 proves reporting the sales transfer results was Christian's primary role and objective. This store transfer strategic initiative was often referred to as the Store Optimization Plan, and was always disclosed to the general public as a "critical priority." This was the only report to see sales lift results and was distributed to and used by the entire company. Christian represented finance in the monthly cross-functional US Retail Store Optimization Plan update meetings.

Exhibit 2

Chris Ronnie, Analyst, Sr. Financial
2015 Annual Appr (NA Only), 04/20/2015 - 12/26/2015

**Author:** Chris Ronnie                          **Role:** Employee
**Status:** Completed                            **Due Date:** 01/06/2016

| Employee Data | |
|---|---|
| **Empl ID :** | 750333 |

The status of this evaluation is Acknowledged.  In this status, you may enter comments in the Employee Comments section, if applicable.  At any time you can save any entries you make on the evaluation by selecting the Save button.

## Section 1 - Make it YOUR Business

**Objective 1: Sales Transfer**

**Description** By end of August, become fully cross-trained on how to update the Sales Transfer Tracker. Provide support to the marketing team to ensure effective analysis and communication of results.

Christian uncovered indisputable errors in the sales transfer model responsible for calculating and reporting out sales lift results, the company's "critical priority" disclosed on SEC filings. An iferror() statement in the Excel model was redirecting

every store's lift result to an erroneous source, deflating sales lift from the actual amount of more than 50% to about 30%, and the error in the sales lift model started about the same week the acquisition was announced, before Christian was employed at the company. Christian was praised for uncovering and correcting the sales lift model error as the finding was indisputable. Christian then started experiencing retaliation, and decided to leverage his rights through Sarbanes-Oxley Act and the Consumer Financial Protection Act of 2010, reporting the retaliation to Human Resources and requesting to change teams, as proven in the e-mails included herein. Christian disclosed the findings and retaliation to HR in February, as stated in the change log email (Exhibit 4), and again in an email to HR on March 8, 2016 (Exhibit 3). Rather than immediately honoring his request, he was demoted from a heirarchical standpoint, as they brought Tiffany, a fellow senior financial analyst he worked with in assembling the sales lift model, from another finance team and put Tiffany in between Christian and his former manager, James.

In the March 8, 2016 email, Christian states, "After disclosing errors and multiple issues related to the accuracy of calculating sales lift from closing sites, I feel that I started to get discriminated against. I want to change roles ASAP, and I have applied to several positions with the company, some are manager roles."

Exhibit 3

| | |
|---|---|
| **From:** | Chris Ronnie <chris.ronnie@officedepot.com> |
| **Sent:** | Tuesday, March 08, 2016 8:55 AM |
| **To:** | Courtney Laukitis; Colleen Atlas |
| **Subject:** | Harassment and Manager Ready |

Hi Courtney and Colleen,

After disclosing errors and multiple issues related to the accuracy of calculating sales lift from closing sites, I feel that I started to get discriminated against. I want to change roles ASAP, and I have applied to several positions within the company, some are manager roles.

I am a Certified Management Accountant since September 2012 with experience in various capacities and industries, and a proven track record for ethics and accuracy.

I also want to reiterate that I do have a business that I manage outside of work (wellness). The company was started in January 2014 and the website has been around since 2013. There is no conflict of interest, though I do incorporate very non-traditional PR, that I have seen a lot of success with.

Regards,

**Christian Ronnie, CMA**
Senior Financial Analyst, Retail | Office Depot, Inc.
6600 N. Military Trail | Boca Raton, FL 33496
Tel: 561.438.3116 | chris.ronnie@officedepot.com

Christian then found another discrepancy in the sales lift model resulting from using two sets of sales data (GSC and APT) with varying amounts of sales included in each. Using the two sales data sets with varying amounts of sales resulted in creating fake lift dollars. Christian found this inaccuracy while already applying to other opportunities within the company. Christian disclosed these inaccuracies in a change log e-mail included herein (Exhibit 4), stating "Last week we found out how timing issues can cause the sales in APT to be different than the sales in GSC…". Proof that Christian uncovered this discrepancy is included herein (Exhibit 5), stating "Christian found and brought to light a significant difference in APT sales and GSC sales while creating the weekly Transfer Scorecard." Christian went above and

beyond the requirements of his role to help resolve the issue and ensure that he wasn't responsible for reporting misleading results of the company's critical priority – Christian started producing two sales transfer results each week, one with the original method that created fake sales lift dollars, and another which used the same sales data set in comparing baseline amounts and the actual sales results amounts. This is mentioned in the change log email. Christian then emphasized the importance of using the same sales data set, since regardless of why the sales data sets may have varying amounts of data, it is important to compare the same amount of sales data when reporting comparative results. Christian was then given an impossible task of finding the source of the differences in the two sales data sets provided by the IT team. Christian requested a meeting with IT to have them provide the source of the discrepancies between the two data sets they provide. Christian was then given an unexpected "final warning" even though there was no preceeding warnings. This "final warning" was in the form of a performance correction plan, but there was no performance correction plan in place. He retreived the source of the differences between the sales data sets from IT, scheduled a meeting with Tiffany to provide the requested information, and was fired at the start of the meeting. The question isn't whether Christian's finding of inaccuracies in the sales lift model was a contributing factor, since the documented reason Christian was fired in the "final warning" was because Christian "found and brought to light a significant difference in APT sales and GSC sales while creating the weekly Transfer Scorecard." (See Exhibit 5)

## Exhibit 4

On Wed, Feb 24, 2016 at 12:21 PM, Chris Ronnie <chris.ronnie@officedepot.com> wrote:
Hi James,

Since you expressed some confusion, please see a summarized change log of the improvements, and top-down decisions that were made in calculating sales lift.

1. When I took over the model, there was a formula error. The lookup range was not extended (probably when the person before me added weeks to the model), causing a look up error. The look up error caused the trend amounts to be pulled from the operating plan (iferror function), not APT, which started in February 2015. The correction resulted in a significant reduction in lift calculation.

2. A decision was made by Adam and Lauren to only look at Wave 2 and Wave 3 stores, removing Wave 1 from the model early. Since there were receiving stores getting lift from multiple closing sites (some of which could have been in Wave 1), a decision was made to freeze the 'balancing stores' formulas of all stores in the model at that point in time. Any new stores would use the original balancing store formula.

2a. Recognizing that freezing the balancing store %s and using the original formula for any newly added stores could create lift dollars, a constraint was included to ensure no receiving store can distribute more than 100% of lift dollars to closing sites (no lift could be created from the balancing formula).

2b. After seeing the difference between the frozen %s with constraints, and the original formulas (distributing exactly 100% of lift dollars), we decided to go back to the original formulas, but include all stores from all waves when determining where the lift was coming from and how to distribute that lift to the closed sites.

3. The method of calculating lift has been to pull sales from GSC and the baseline amounts from APT. Last week we found out how timing issues can cause the sales in APT to be different than the sales in GSC, which can cause an inaccurate calculation of lift since the APT baselines are calculated using selected control sites' actual sales. I am updating two different versions of the Sales Lift model, one using APT sales and one using GSC sales. I am going to present the difference to Lauren in our weekly meeting today and determine what we should use going forward.

I will continue to keep you updated on all relevant communications and decisions surrounding the sales lift model.

Also, I have communicated to HR my intent to seek other opportunities within the company, to which I am actively applying. I have been a Certified Management Accountant since 2012, with experience in sales & marketing / commercial, supply chain & operations, and accounting, as well as other consulting and personal project management work. If you have any insights or recommendations based on your experience with the company, please let me know.

Regards,

**Christian Ronnie**
Senior Financial Analyst, Retail | Office Depot, Inc.
6600 N. Military Trail | Boca Raton, FL 33496
Tel: 561.438.3116 | chris.ronnie@officedepot.com

lift calculation = baseline calculation, supposed to come from APT (3rd party unbiased company) as the one and only lift calculation to compare with actuals, resulting in Store Closure Rates. The Store Closure Rates increased from –30% to over 50% as a result of me finding this redirection. This was the key finding that initiated the retaliation.

Exhibit 5

## Performance Correction Document

*Manager Instructions: This form is to be used by Managers to document misconduct, attendance issues and basic performance deficiencies. This document should be reviewed and signed by the Associate, and then placed in the Associate's personnel file.*

**A signed copy of completed document should be scanned and emailed to <u>HR-Employee-Services@officedepot.com</u>**
*If email system is unavailable, please fax to HRES at (561) 438-8746.*

| General Information | | |
|---|---|---|
| Associate Name: Chris Ronnie | | EMPL ID# 750333 |
| Date of Occurrence: 4/7/16 | | Location # 10000 |
| Manager Name: Tiffany Schlotter | | Manager EMPL ID# 576734 |
| **Description of Occurrence:** | X Performance/Conduct | □ Attendance |

Chris found and brought to light a significant difference in APT sales and GSC sales while creating the weekly Transfer Scorecards in February. Chris was originally asked to look into the root cause of differences between GSC sales and APT sales on 3/3/2016. After no progress was made, the task was officially assigned to Chris on 3/8/16 by James Hoganson in the weekly Transfer Scorecard meeting. On 3/10, Chris sent an email to IT, but no follow-up was noted. I assigned the task again in a meeting recap email after the 3/15 Transfer Scorecard meeting with a due date of 3/22/16. A couple emails were sent on 3/15, but no follow-ups were noted. On 3/16 Chris sent an email showing the dollar difference by store between the two systems. I responded the same day in email stating that knowing the impact is good but knowing the cause is the important part. On 3/21 David Dubbin set-up a meeting with Chris to try to work through the differences with David doing most of the work and no significant progress made. In the 3/22 meeting, there was no real progress in spite of the due date. I spoke directly with Chris on the morning of 3/29 and advised him to set-up a meeting with IT so that we could get going on this before the Transfer Scorecard weekly meeting on 3/30. An email was sent, but no meeting was scheduled. As of the weekly meeting on 4/5, there was no further follow-up by Chris from the email sent 3/29.

In the four weeks since the task was initially assigned, Chris has not personally made any meaningful progress on the research and doesn't seem to have any interest in doing so. In conversations and in emails, he continues to express his belief that we should switch to APT sales without first determining the root cause of the differences between systems. He has also expressed in multiple emails that the team has aligned to switching even though we are waiting on the finalization of this task to do so.

Chris complained about James Hoganson's management style. After discussing the issues with both James and HR, Chris inaccurately communicated to James and the team that he would no longer be working with James. HR corrected Chris on this matter stating that Chris's response was unprofessional and disrespectful. Chris has a job to do, which involves working with James (even though he does not report to James directly) and communicating with James and the team members in a professional and respectful manner.

### Performance Expectations and Suggested Actions for Consideration

Perform the expected requests/tasks asked by his manager without resistance or repeated reminders/follow up by his manager. All conduct and communications should be professional and respectful.

### Coaching History (i.e., verbal discussions, coaching and feedback)

At the 3/8 meeting and the 3/15 meeting with the team (James Hoganson, Lauren Goldberg, Adam Haggard, David Dubbin, Tiffany Schlotter, Chris Ronnie) the need for this analysis and reconciliation was discussed at length because of the implications of making a change and sharing the reasoning with Executive Mgmt.

On 3/15, in order to help the process along, James Hoganson called IT and then sent an email and copied Chris to explain the need and that Chris would be following-up.

On 3/29, I had a conversation with Chris to follow-up on progress and suggest ideas to move the process along before the 3/30 meeting that Chris chose not to attend.

### Discipline History

Check level of current discipline and insert date of previous discipline issued within the last 12 months (the Company may skip any step depending on the nature and severity of the issue):

| **Current Discipline** | **Previous Discipline Date** |
|---|---|
| □ Warning | _____ |
| X Final Warning | _____ |
| □ Administrative Leave | _____ to _____ (subject to change) |
| □ Termination of Employment | _____ |

## Summary of the Argument

The Appellant was a senior financial analyst at a publicly traded company with responsibilities of reporting what was descibed to investors as the company's "critical priority." The Appellant uncovered more than just "misleading" information disclosed on SEC filings, the Appellant found that results of the critical priority were indisputably so substantially inaccurate, that they would have caused opposite actions of investors. The sales transfer transfer results, referred to as the Store Optimization Plan, were reported to investors on the SEC 10k filing as "lower than projections" when they were actually much higher than expectations. The sales lift that was being reported jumped from just over 30% of total sales to more than a 50% increase on billions of dollars of sales. These billions of dollars in sales lift discrepancies more than misled the investors on the performance of the company's critical priority, it was misleading in that it indicated a market that was not monopolistic and anti-competitve and promoted the FTC approval of the $6.3 billion acquisition. Reporting the accurate amount of sales lift, rather than the "lower than projections" amount disclosed to investors, would have helped investors with seeing that the market was in fact too anti-competitive and monopolistic, and would have helped them align with the ultimate FTC decision of denying the acquisition. The Appellant leveraged his rights covered under each of the statutes, Sarbanes Oxley Act (SOX) 18 U.S.C. §1514A and Consumer Financial Protection Act of 2010 (CFPA), Section 1057 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 12 U.S.C. § 5567. After already experiencing and reporting retaliation resulting from uncovering

that the "lower than projections" performance of the company's critical priority, the Appellant was fired with the only factor being that he uncovered the misleading information.

## Statement of Facts

1. Christian, the Appellant, was hired by Office Depot, Inc. as a senior financial analyst on April 20, 2016

2. Office Depot, Inc. (ticker: ODP) changed its name to ODP Corp, and was a publicly traded company while the Appellant was employed. This means ODP was responsible for reporting all results to the general public through public filings, such as 10K SEC filings. The company is not owned by the employees of the company, it is owned by the investors and the members of the general public whom receive the reported results.

3. Christian's key responibility was being the finance lead of the US Retail Store Optimization Plan, and was responsible for reporting the results through the Sales Transfer Scorecard. These results were referred to as various names on public disclosures, SEC filings, and throughout the company, including sales transefer, sales synergies, sales lift, sales optimization results, sales transfer scorecard, Office Depot/Office Max sales synergy results.

4. The US Retail Store Optimization Plan (sales lift results) was described to investors in SEC filings as one of the company's "critical priorities" and therefore was without a doubt, a protected activity, and a major driver of investor decision, reported performance, and thus, stock price.

5. Christian was hired after the $6.3 billion acquisition from rival Staples, Inc. was announced and the Federal Trade Commission (FTC) was analyzing market competitiveness to determine whether the acquisition would be

approved or if the acquisition would be too anti-competitive. The sales lift results that Christian reported indicated market competitiveness, since a higher amount of sales retention (sales lift) means a more monopolistic environment. Speculation on whether the FTC would approve the acquisition was the key driver of stock price, as the stock price of a company jumps to purchasing price as long as the acquisition is approved. Christian found that the results being reported on SEC disclosures as "lower than expected" were actually deflated through indisputable errors in the sales transfer Excel model, resulting in the actual results being about double the erroneous "lower than expected" amounts reported to investors, jumping from about 30% to more than 50% lift.

6. After Christian found that the sales lift results were actually double than what was being reported, he was praised for finding the sales redirection. The company started reporting the actual corrected sales lift results of greater than 50%, rather than the "lower than expected" amounts of about 30%. Christian started experiencing retaliation immediately within his team, and disclosed to HR what happened and told them he wanted to change teams immediately. This is mentioned in the e-mail sent on 2/24/2016, included herein (Exhibit 4), where Christian highlights the findings in a change log e-mail and mentioned that he was applying to other opportunities within the company.

7. Christian found another cause of inaccuracy in the sales lift model, resulting from comparing two data sets of actual sales results with varying amounts of sales included in each. These two sales data sets were referred to as the GSC sales data set and the APT sales data set. Using one to calculate baseline

amounts, and comparing them with the other that included more sales was creating fake sales lift dollars. Christian mentions this in the 2/24/2016 e-mail (Exhibit 4), stating "Last week we found out how timing issues can cause the sales in APT to be different than the sales in GSC…". Proof that Christian uncovered this discrepancy is included herein (fact 9). While the approval of the change in using just one sales data set was pending, Christian started creating and reporting out two sales lift models each week, one using the original method, and a second using the same data set to eliminate the discrepancy. This is mentioned in point 3 of the change log e-mail sent on 2/24/2016 (Exhibit 4).

8.  Christian reported harrassment and retaliation again to Human Resources in an e-mail sent on March 8, 2016, where he mentions again that he is looking to change roles immediately and is applying to jobs within the company. At the time of writing this email, Christian was never put on any performance plan, nor was he ever issued a formal warning or performance issue.

9.  On April 7,2016, Tiffany, who was put in between Christian and his former manager, James, following Christian's email complaining about retaliation and requesting to distance himself from the report, issued Christian a "Final Warning" without any preceeding warnings. This Final Warning was not part of a performance plan, as Christian was never put on a performance plan. This was the only performance correction document Christian ever received. This Final Warning stated that Christian is the one who uncovered the discrepancies in the sales data sets. The Final Warning starts with, "Christian found and

brought to light a significant difference in APT sales and GSC sales while creating the weekly Transfer Scorecard." All of the dates and complaints mentioned on the Final Warning were after the email sent to Human Resources complaining about retaliation and requesting to change teams. Christian was actively attempting to obtain the source of the discrepancies from the IT team who was responsible for providing these data sets during the time of receiving the Final Warning. The request from Tiffany to identify the source of why the two data sets being sent from IT contained varying amounts of sales data was outside the scope of Christian's role.

10. In April 2016, following the unexpected Final Warning related to Christian's disclosure of discrepancies from the IT team, which were in place since before Christian was hired, Christian continued to request meetings with the IT team to talk about why the two data sets contained different amounts of sales. The reason why two data sets might be different is irrelevant – the key point is we should have been using the same data set with calculating baseline amounts so not to create fake sales lift dollars. Christian scheduled the meeting with IT and finance, including Tiffany to talk about the sales data sets, and only Christian showed up from finance. Christian obtained the requested discrepancy sources, and scheduled a meeting with Tiffany to disclose the information on why the results were misleading. Tiffany showed up to the meeting with an HR employee, and fired Christian at the very start of the meeting, before Christian was able to disclose the information.

11. The violations occurred because Christian reasonably believed the information being reported to the general public through SEC filings was significantly misleading. Christian leveraged all of his rights through the SOX and CFPA, including CFPA (4) "objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed" to be misleading, and SOX (1) "to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes" misleading information is being disclosed at a publicly traded company.

# CONCLUSION

The judgment of the Administrative Review Board should be reversed.

**Certificate of Compliance**

I certify that this brief complies with the Typeface requirements set forth in Federal Rule of Appellant Procedure 32(a)(5), the Type Styles requirements set forth in Federal Rule of Appellant Procedure 32(a)(6), and the Length requirements set forth in Federal Rule of Appellant Procedure 32(a)(7). This brief uses a proportionately spaced typeface with 14 point New Times Roman style. This brief contains 4,251 words.

/ s / Christian Ronnie

Christian Ronnie

**Certificate of Service**

I hereby certify that on this day, September 13, 2021, I electronically filed this Brief with the Clerk Office for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system.


/s/ Christian Ronnie

Christian Ronnie